**INTERNATIONAL DISTRIBUTION CENTERS, INC., Plaintiff,**

v.

**WALSH TRUCKING CO., INC., Coastal Freight Lines, Inc., Hempstead Delivery Co., Inc., National Retail Transportation, Inc., Francis J. Walsh, Jr., Kenneth B. Henning, Mark S. Tice, Raymond Weiss, Carmine Sabatini, and Chuck Hannon, Defendants.**

No. 82 Civ. 8709 (JFK).

United States District Court,
S.D. New York.

June 19, 1985.

Malcolm A. Hoffmann, Craig Schiller, Peter L. Altieri, Law Firm of Malcolm A. Hoffmann, New York City, for plaintiff.

Milton Handler, Gerald Sobel, Alan F. Goott, Kaye, Scholer, Fierman, Hays & Handler, Marc Zoldessy, Simon, Uncyk & Borenkind, New York City, for defendants.

## OPINION and ORDER

KEENAN, District Judge:

### STATEMENT

Plaintiff has prevailed after a trial of more than six weeks on three Sherman Act ("Act") antitrust claims. The Court heard 30 days of testimony from 30 witnesses and received hundreds of exhibits in evidence. The jury has awarded to plaintiff antitrust damages in the amount of $13,208,697.00 which are to be trebled under the Clayton Act for a total award of $39,626,091.

Plaintiff International Distribution Centers, Inc. ("IDC") is a trucking company which transports Garments on Hanger (GOH) in Less Than Truckload (LTL) quantities along the traffic lane running between Pennsylvania and New York City.

Plaintiff alleged that (1) Frank Walsh and the corporate defendants attempted to monopolize the LTL transportation of GOH among garment manufacturers, suppliers, contractors and retailers along the so-called Pennsylvania "corridor," or traffic lane, i.e., the New York, New Jersey, Pennsylvania route, thereby causing antitrust injury to IDC; (2) defendants conspired with one or more other persons to unreasonably restrain trade in connection with LTL transportation of GOH among garment manufacturers, suppliers, contractors and retailers along the so-called Pennsylvania "corridor," thereby proximately causing antitrust injury to IDC; and (3) defendants conspired with one or more other persons to monopolize the LTL transportation of GOH among garment manufacturers, suppliers, contractors and retailers along the so-called Pennsylvania "corridor," thereby proximately causing antitrust injury to IDC. On these three counts, the jury found for plaintiff after three days of deliberations.

Plaintiff also urged that one or more of the defendants induced key IDC employees to leave IDC's employ in order to obtain plaintiff's trade secrets for defendants' use, thereby causing injury to IDC. Finally, plaintiff alleged that the defendants solicited plaintiff's customers by utilizing IDC trade secrets, thereby causing injury to IDC. The jury found that plaintiff had failed to meet its burden with regard to its possession of trade secrets and dismissed the plaintiff's two trade secrets contentions.

Having found for the plaintiff on the three antitrust claims, the jury did not consider defendants' counterclaim for unfair competition.

The jury was charged on the elements of attempted monopolization under Section 2 of the Sherman Act, the elements of conspiracy to monopolize under Section 2 of the Act and the elements of conspiracy to unreasonably restrain trade under Section 1 of the Act. Further, the jury was charged at length on antitrust damages and was specifically told that "the plaintiff is not entitled to speculative damages and you should not engage in guesswork." (Transcript ("Tr.") 4704).

Prior to summations, defense counsel requested that the members of the jury be specifically told that they could make notes of exhibit numbers as the exhibits were referred to by counsel during summations so that the jury could request the exhibits

during its deliberations. The Court granted this application and the jury made notations and did request many of the exhibits referred to and relied on by counsel in their closing arguments.

It is in this context that defendants move for judgment n.o.v., or for a new trial, pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court has carefully reviewed the trial transcript of over 4,700 pages and studied the excellent submissions by counsel on both sides.

### DISCUSSION

#### Legal Standards for Judgment N.O.V. and New Trial

Defendants have moved for judgment n.o.v. or a new trial under Rule 50 of the F.R.Civ.P.. These motions are denied for the reasons set forth below. However, remittitur is ordered and the amount of the award is reduced for the reasons set forth on p. 102 et seq. *infra*.

■ In *Tennant v. Peoria & Pekin Union R.R. Co.* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944), the Supreme Court set forth the function of the trial court in reviewing a jury verdict:

> Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Accord Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959). Judgment n.o.v. is to be granted only when:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Mattivi v. South African Marine Corp.*, 618 F.2d 163, 167–68 (2d Cir.1980).

It is in this framework that the Court approaches this motion.

A. *Attempted Monopolization under Section 2 of the Sherman Act*

Defendants maintain that plaintiff failed to establish that defendants violated Section 2 of the Sherman Act by attempting to monopolize the relevant market.

1. *Dangerous Probability of Success*

The defense urges in this motion that there was no "dangerous probability of success" and that therefore plaintiff's claim must fail since such must be shown to establish an attempt to monopolize under Section 2 of the Sherman Act. *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir.1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). In this regard the Court charged the jury as follows:

> A dangerous probability means more than a mere possibility. It means a reasonable likelihood that by resorting to unlawful acts Walsh and/or NRT have come dangerously close to achieving a monopoly position. [Tr. 4689].

Plaintiff argues with some force that there was overwhelming evidence that the defendant Frank Walsh had a specific intent to monopolize. There was an abundance of proof to that effect before the jury. In his treatise, Professor Sullivan writes at p. 138 in "The Law of Anti-Trust," Section 51 (1977):

> Neither is there reason to hesitate to condemn conduct short of close probability of success on the ground that such a rule would unduly discourage effective, though aggressive, competitive conduct. By requiring (under the intent test) that the conduct be of a kind plainly threatening competitive conditions, the rule already filters out any serious risk that desirable conduct will be inhibited. Conduct which constitutes an attempt is predatory, coercive, or calculated to heighten entry barriers; there is nothing which should make us hesitate to condemn it if the evidence leaves no doubt that the conduct has been properly characterized.

The Second Circuit in *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 85 (2d Cir.1981) (citation omitted), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), pointed out that "[b]ecause section 2's prohibition of attempts to monopolize encompasses conduct by firms lacking monopoly power ... its potential reach is broader than the proscription against monopolization."

At trial plaintiff produced witnesses in the garment industry who testified to the limited number of trucking companies which transported GOH in LTL quantities in the Pennsylvania traffic lane. Given this limited number of competitors and the significant amount of business which IDC established it lost to the Walsh interests, the jury could reasonably have inferred that defendants possessed, in the words of the Court's charge (Tr. 4690), "sufficient market power to render their conduct likely to succeed." The Walsh companies possessed real economic clout compared to competitors in the market. (Tr. 1336, DTX 717). Three months after entering the market, defendants had procured seven of plaintiff's customers with annual sales of over $1 million. In addition, Walsh interests had recently purchased three companies doing business in the relevant market and had conferred with principals of other competitors regarding possible acquisition by the Walsh interests. Testimony of Walsh's power in the industry was received at several points in the proceeding. (Tr. 804, 1897–1901, 2141–42, 2283–89, 2293).

Further, there was ample evidence, if believed, of barriers to entry into the market (Tr. 474–75, 2937 and 2929) and of the existence of both a relevant product market (Tr. 1468, 1515–16, 2813, 2825–26, 4341, DTX 233) and geographic market. (Tr. 476–77, 1466–68, 2120, 4338). It should be noted that the defense was the source of some of the evidence just cited.

■ Based on the proof presented at trial, this Court cannot conclude that "there is ... a complete absence of evidence [supporting the verdict].... or.... an over-whelming amount of evidence in favor of the movant," *South African Marine Corp.*, 618 F.2d at 167–68, on the issue of dangerous probability of success.

### 2. *Predatory Pricing*

In support of its motion, the defense seems to concede that the Court properly instructed the jury on this issue of anticompetitive conduct (Defendants' Brief at 35, 37), but argues that plaintiff failed to meet its burden in this regard and that the verdict was "in blatant disregard of the Court's instructions." (Defendants' Brief at 38). Plaintiff, of course, argues that "the evidence shows predatory pricing in the traditional sense ..." (Plaintiff's Brief at 55). Both sides cite *Northeastern Telephone, infra* p. 102, to buttress their arguments.

The plaintiff called as its experts Dr. Irwin Silberman and Ernest L. Sommer, each of whom testified at great length. (Tr. 2692–2751, 2757–2803, 2806–63, 2882–2937, 4333–70, 4429–65, 4469–75). The *Areeda-Turner* rule on predatory pricing was explored in front of the jury. In fact, Professor Areeda's deposition testimony relative to anticipated costs and predation was read into the record. (Tr. 3936). A fair reading of the Silberman testimony (Tr. 2911–20, 4355–56) demonstrates again that the jury was not unreasonable in concluding that plaintiff's experts applied correct standards as to fixed and variable costs. Moreover, plaintiff offered evidence which, if believed, could lead the trier of the facts to conclude that defendants' pricing was neither temporary nor designed to acquire new business lawfully. (Tr. 2832–33, 2911–19).

The jury was justified in finding that Frank Walsh and the corporate defendants attempted to monopolize the LTL transportation of GOH in the Pennsylvania Corridor in violation of Section 2 of the Sherman Act.

### B. *Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act*

At page 64 of its memorandum on this motion, the defense states that "the Court

correctly instructed the jury" on the conspiracy to monopolize issue but that there was not proof that a conspiracy existed. The Court finds that there was sufficient proof from which the jury could have inferred the existence of conspiracy prior to the time when individual defendants left IDC and joined the Walsh group. (Tr. 1160–62, 3155–56, 3161–62, 3374–75).

■ Since a finding for the plaintiff on the conspiracy to monopolize issue requires proof of the elements of an attempt to monopolize, plus proof of a conspiracy, the Court concludes, based on its reasoning at pages 100–01 *supra*, and the fact that there is evidence of a conspiracy, that the jury had a rational basis to conclude that the defendants violated Section 2 by conspiring to monopolize.

### C. Conspiracy to Unreasonably Restrain Trade Under Section 1 of the Sherman Act

On this issue, defendants argue that plaintiff failed to prove the existence of a conspiracy and failed to prove an unreasonable restraint on competition in a relevant market. As pointed out above, the jury had a rational basis for finding the existence of a conspiracy.

As to the issue of whether there existed unreasonable restraint on competition in a relevant market, the Court finds that there was a sufficient basis for the jury to conclude that a relevant market existed, p. 101 *supra*. The Court cannot conclude that the jury was in error in finding that such a conspiracy was an unreasonable restraint of trade. The jury had sufficient evidence before it to decide that defendants' conduct was anti-competitive and that their purpose was to destroy competition. (Tr. 252, 253, 2919, PX 93).

### Damages

■ It is well established law that a treble damage award may not be predicated upon speculation or guesswork. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). What is required to sustain a damage award in a case such as this is that there be a reasonable basis for estimating damages "based on relevant data." *Bigelow v. RKO Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). The jury was specifically charged that "the plaintiff is not to be awarded speculative damages," "the plaintiff is not entitled to speculative damages and you should not engage in guesswork." (Tr. 4704).

The plaintiff offered evidence that it lost $7,278,202 in the year March 1, 1983 to February 29, 1984, thereby causing injury to the plaintiff in the amount of $1,848,663.

IDC has used a "before and after" damage theory in support of its claim. Plaintiff took March 1, 1982 through February 28, 1983 as its "before" period and March 1, 1983 through February 29, 1984 as its "after" period. Under the facts of this case, the choice of these periods was not unreasonable. IDC began to feel the impact of losing customers in early 1983 and Dr. Silberman's damage report was due in April 1984 so plaintiff could be ready for trial.

As its "before" figure plaintiff claims to have proven revenues in the Pennsylvania "corridor" of $22,705,313 and while defendants have not directly challenged the accuracy of this figure, the Court concludes that the figure is in error because it includes revenues directly attributable to the Germantown, New York, IDC Terminal. (Tr. 2858). The undisputed evidence is that the Germantown Terminal served the Southern tier of New York State and the New England states of Vermont, Massachusetts and Connecticut, not the Pennsylvania "corridor." (Tr. 2051).* The Silber-

* It should be noted that in its moving papers, the defense attacks the amount of the verdict as unreasonable and not supported by the evidence. Nowhere in the papers does the defense specifically urge that the Germantown, New York revenues be excluded from the damage award although passing reference to the Germantown revenues was made in defense coun-

man damage report (PX 224) indicates that IDC received $908,805 in revenue from March 1, 1982 through February 28, 1983 at Germantown. Thus, the "before" revenue figure should be reduced to $21,796,508.

IDC maintains that it established Pennsylvania "corridor" revenues of $15,427,111 in the "after" period of March 1, 1983 through February 29, 1984. Again, plaintiff included revenue from the Germantown, New York Terminal in its calculation. The damage exhibit (PX 224) shows $658,253 in revenue at Germantown during this "after" period. This requires reducing the "after" revenue amount to $14,768,858. Subtracting the corrected "after" amount from the corrected "before" amount establishes a difference in revenues of $7,027,650, not $7,278,072, the figure claimed by plaintiff.

To arrive at a lost profit figure plaintiff's expert, Dr. Silberman, concluded that IDC was able to avoid 74.6 cents in costs for each dollar of revenue it lost. He also concluded that IDC lost 25.4 cents per dollar as a contribution to overhead by virtue of its lost revenues. The Court does not fault these calculations in any way. Dr. Silberman called the .254 a lost "contribution" (Tr. 2842) and multiplied the difference in revenue figure by .254 to arrive at the figure of $1,848,663 (p. 102 *supra*) as the amount of injury caused to plaintiff. Since the Germantown, New York revenues were improperly included, the amount should be $1,785,023 (7,027,650 × .254).

Plaintiff urged the jury that it should recover lost future profits and offered evidence as to lost profits for a 10 year period. This is not an unreasonable period. *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 567 (2d Cir.1970). This 10 year amount of $18,486,630, however, is in error because it includes the Germantown, New York revenues. The correct lost profit sum should

be $17,850,230. The defense urges that plaintiff is not entitled to any lost profits claiming that plaintiff failed to establish that the injury was permanent. There is evidence to the contrary (Tr. 434, 435) from which the jury could have concluded that the injury was permanent.

The defense argues that the projection of damages should be reduced to present value by utilization of a 20% interest rate. Plaintiff, through Dr. Silberman, urged the application of a 10% interest rate to arrive at the present value figure. There is nothing unreasonable in the jury having accepted the 10% rate. Use of the 10% rate requires a multiplier of .6145 according to "Principles of Corporate Finance." (PX 253). The multiplier was explained in the Silberman testimony. (Tr. 2846–2850).

The calculations with the Germantown, New York figures included are as follows:

| | |
|---|---|
| $18,486,630 | (10 year lost future profits) |
| × .6145 | (Reduce to present value at 10% interest rate) |
| 11,360,034 | |
| +1,848,663 | (Lost profits for "after" period) |
| 13,208,697 | (Total lost profits) |
| × 3 | (Clayton Act trebling) |
| $39,626,091 | (Total Damage Award) |

■ The proper calculations with the Germantown Terminal amounts excluded are as follows:

| | |
|---|---|
| $17,850,230 | (10 year lost future profits) |
| × .6145 | (Reduce to present value at 10% interest rate) |
| 10,968,966 | |
| +1,785,023 | (Lost profits for "after" period) |
| 12,753,989 | (Total lost profits) |
| × 3 | (Clayton Act trebling) |
| $38,261,967 | (Total Damage Award) |

Although defendants specifically have indicated they are not interested in a remit-

sel's summation. (Tr. 4554). In oral argument on this motion (Tr. 42, 43), the Court inquired of counsel for the plaintiff about the propriety of the inclusion of the Germantown revenue figures. This prompted defense counsel in their Reply oral argument to suggest that "there is

also a fatal inconsistency in including the Germantown figures in the damages study." (Tr. 54). The Court is excluding the Germantown revenues since they clearly are not derived from the Pennsylvania traffic lane revenues and thus are not properly part of the damage award.

titur (p. 74 Reply Memorandum) and the Court recognizes that "Remittitur is a limited exception to the sanctity of jury fact-finding." *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 902 (2d Cir.1982), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 700, 79 L.Ed.2d 165 (1984), the Court feels that the interests of justice require such a result in this case in view of the improper inclusion of the Germantown, New York Terminal revenues in the damage award. This is not a case like *Perfect Fit Industries v. Acme Quilting Co.,* 494 F.Supp. 505 (S.D.N.Y.1980), (modified on other grounds), 646 F.2d 800 (2d Cir.1981), a libel case cited by defendants. Here, "the Court can identify.... a quantifiable amount that can be stricken." *Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984). Remittitur is the proper result in this case.

### CONCLUSION

The motions for judgment n.o.v. or for a new trial are denied. Remittitur is ordered. The jury award is reduced to $12,-753,989 which trebled under the Clayton Act becomes $38,261,967.

SO ORDERED.