812 F.2d 786
 1987-1 Trade Cases 67,457
 INTERNATIONAL DISTRIBUTION CENTERS, INC., Plaintiff-Appellee,
v.
WALSH TRUCKING CO., INC., Coastal Freight Lines, Inc.,
Hempstead Delivery Co., Inc., National Retail Transportation
Inc., Francis J. Walsh, Jr., Kenneth B. Henning, Mark S.
Tice, Raymond Weiss, Carmine Sabatini and Chuck Hannon,
Defendants-Appellants.
 No. 1280, Docket 86-7122.
 United States Court of Appeals,
Second Circuit.
 Argued May 19, 1986.
Decided Feb. 24, 1987.
 
 Stanley D. Robinson, New York City (Milton Handler, Gerald Sobel, Randolph S. Sherman, Alan F. Goott, John W. Schryber, Kaye, Scholer, Fierman, Hays & Handler, New York City, Marc L. Zoldessy, General Counsel, National Retail Systems, Inc., North Bergen, N.J., of counsel), for defendants-appellants.
 Malcolm A. Hoffmann, New York City (Peter L. Altieri, Lisa A. Frey, New York City, George J. Hayward, General Counsel, Intern. Distribution Centers, Inc., North Bergen, N.J., of counsel), for plaintiff-appellee.
 Before OAKES, MESKILL and MAHONEY, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from the second amended judgment of the United States District Court for the Southern District of New York, Keenan, J., following a jury verdict for the plaintiff, International Distribution Centers, Inc. (IDC), the denial of a motion by National Retail Transportation, Inc. and other individual and corporate defendants (collectively referred to as NRT) for judgment notwithstanding the verdict and the court's entry of a permanent injunction and order for attorneys' fees. The judgment held that NRT had attempted to monopolize, conspired to monopolize and conspired to restrain trade in the market for the carriage of garments on hangers among garment manufacturers, suppliers, contractors and retailers "along the New York, New Jersey, Pennsylvania route," in violation of sections 1 and 2 of the Sherman Act. 15 U.S.C. Secs. 1, 2 (1982). Treble damages in the amount of $38,261,967 were awarded to IDC, 618 F.Supp. 98.
 
 
 2
 The principal issue on appeal is whether there can be a dangerous probability that a market will be monopolized where one firm in the market has the specific intent to drive a competitor from the market and has engaged in arguably tortious activity to achieve that objective but does not have significant market power and will not possess such power even if the competitor is driven out of business. We conclude for reasons set forth below that no such probability can exist in these circumstances. We decline to eliminate such probability as a prerequisite for the recovery of damages for attempted monopolization. We, therefore, reverse the judgment below and remand to the district court with instructions to enter judgment for NRT.
 
 BACKGROUND
 
 3
 NRT and IDC are truckers operating in the less-than-truckload (LTL) segment of the garment transportation industry.[1] They pick up quantities of goods from individual shippers, consolidate and sort the loads according to destination, carry the full loads to a distribution center, break the loads down and deliver the small lots to their final destination. IDC transports raw materials and garments on hangers between the garment district in New York City and contractors located primarily in eastern Pennsylvania. NRT also carries garments on hangers in this geographical market, which has been identified in this litigation as the "Pennsylvania Corridor."
 
 
 4
 The structure of the market for the carriage of garments on hangers in the Pennsylvania Corridor changed during the years preceding this litigation. In 1982, IDC estimated that it was carrying less than fifty percent of the garments that it had handled in 1975 and projected that there would be a continuing decline in the total volume of garments on hangers transported by truck into the Pennsylvania Corridor. For some reason the market improved somewhat in 1983 and IDC estimated that it had a fifty percent market share in the Pennsylvania Corridor in that year.
 
 
 5
 NRT, which was already operating in other markets, did not begin carrying garments on hangers in the Pennsylvania Corridor until January 1983. In order to expand its operations to include carrying garments on hangers in the Pennsylvania Corridor, NRT had to modify vans by installing metal bars or nylon ropes, lease terminals for its distribution network and train personnel in the rudimentary techniques of processing garments on hangers for carriage and distribution.
 
 
 6
 In late 1982, NRT's preparations to enter the Pennsylvania Corridor included the hiring of several disaffected IDC employees. IDC's president and chief executive officer, Gerald Eskow, was concerned enough about the incipient employee "raid" to request a meeting with Francis Walsh, his counterpart at NRT. At trial the two men gave dramatically different accounts of that meeting. We read both accounts in the light most favorable to upholding the jury's verdict. The meeting occurred in Walsh's office on November 3, 1982. Walsh confided at the meeting that "he was determined to completely obliterate IDC," that "he was particularly thrilled with the prospect of destroying Jerry Eskow" and that "he couldn't wait to mount [Eskow's] head on his wall." J.App. at 335-36.
 
 
 7
 Walsh told Eskow he had a plan for obliterating IDC and monopolizing the carriage of garments on hangers in the Pennsylvania Corridor. Walsh had first tried to buy out IDC. When that failed, he began hiring several of IDC's key employees to destroy its "credibility" and planned to start a price war to put IDC in a " 'no-win' situation." J.App. at 333-34.
 
 
 8
 In the wake of this declaration, IDC filed suit against NRT on December 29, 1982. IDC alleged, inter alia, that NRT had attempted to monopolize the carriage of garments on hangers, had conspired to monopolize the carriage of garments on hangers, had conspired to restrain trade and had wrongfully appropriated IDC's trade secrets. IDC obtained a preliminary injunction prohibiting NRT's further hiring of IDC employees and use of its trade secrets.
 
 
 9
 Trial of the case began in June 1984. IDC's theory of the case revolved around Walsh's purported plan to obliterate IDC. It attempted to prove the antitrust and trade secret claims in that context. NRT contended that it was only trying to promote competition. It argued that IDC was run by an incompetent president who was using the lawsuit to protect IDC's share of the Pennsylvania Corridor market.
 
 
 10
 NRT sought to defeat the antitrust claims by demonstrating that there was not a "dangerous probability" that NRT could successfully monopolize the Pennsylvania Corridor. See Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, 85 (2d Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). It attempted to prove, for example, that several trucking firms had expanded into and were competing in the relevant market, that numerous firms could easily enter the market and thus that NRT would not be able either to control prices or to restrain competition even if IDC went out of business. NRT also attempted to prove that it lacked sufficient market power to make monopolization of the market probable.
 
 
 11
 After six weeks of trial and two days of deliberation, the jury returned a verdict for IDC on all three antitrust claims and a verdict for NRT on the trade secrets claim. NRT's motion for judgment notwithstanding the verdict was denied by the court in an opinion filed June 20, 1985. This appeal followed further proceedings that are not directly relevant here.
 
 
 12
 NRT frames its appeal as an attack on the sufficiency of the evidence to support the verdict against it. It claims that there was insufficient evidence that NRT (1) attempted to monopolize the market for the carriage of garments on hangers in the Pennsylvania Corridor, (2) conspired to restrain trade in that market, and (3) conspired to monopolize that market. We address these claims in order.
 
 DISCUSSION
 A. Attempt to Monopolize
 
 13
 Liability for attempted monopolization rests on proof of three elements: (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a "dangerous probability" that the attempt will succeed. Northeastern Telephone, 651 F.2d at 85; see also 3 P. Areeda & D. Turner, Antitrust Law, p 820 at 312 (1978). The heart of NRT's argument on this appeal is that there was not a dangerous probability that it would monopolize the market for the carriage of garments on hangers in the Pennsylvania Corridor. IDC responds by arguing not that there was sufficient evidence to demonstrate such a probability, but rather that when anticompetitive acts and specific intent to monopolize are "clearly proven" then "little more is needed to establish the offense." Br. of Plaintiff-Appellee at 15 (citations omitted).
 
 
 14
 For purposes of our analysis, we will presume that there was sufficient evidence to establish that NRT engaged in some form of anticompetitive conduct and had the specific intent to monopolize the Pennsylvania Corridor.[2] The question remains whether even strong evidence of these two elements was sufficient to allow the jury to infer that there was a dangerous probability that the market would be monopolized by NRT.
 
 
 15
 IDC relies on a line of cases from the Ninth Circuit that allow the jury to infer the existence of such a dangerous probability from proof of the other two elements. See, e.g., Janich Brothers, Inc. v. American Distilling Co., 570 F.2d 848, 853 (9th Cir.1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Lessig is the progenitor of this line and, as one academic has noted, it has had a "remarkably checkered career even in the Ninth Circuit." Cooper, Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two, 72 Mich.L.Rev. 373, 420 & nn. 168-74 (1974); see also United States v. American Airlines, Inc., 743 F.2d 1114, 1119 (5th Cir.1984). We implicitly rejected the Lessig standard on an earlier occasion. FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1030 (2d Cir.1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). For reasons more fully explained below, we explicitly reject it here.
 
 
 16
 IDC next argues that "dangerous probability" relates to the substantive crime of monopolization and should be irrelevant to an attempt to monopolize. It maintains that requiring proof of NRT's dangerous probability of monopolizing the relevant market is like requiring proof that five floors of a ten story building had burned to sustain a conviction for attempted arson.
 
 
 17
 IDC's analogy is inapposite. The actual burning of any small part of a building transforms attempted arson into the substantive crime, while an actual effect on some small part of a market does not amount to monopolization of the market. IDC's analogy is not helpful in determining how the law should distinguish between the attempt to monopolize, which reaches further than the proscription against monopolization, Northeastern Telephone, 651 F.2d at 85, and the completed act of monopolization.
 
 
 18
 Moreover, IDC's argument ignores the history of judicial interpretation of the term "monopoly" as it relates to both the substantive act and the attempt. We have consistently interpreted both monopoly and the attempt to monopolize as requiring some measure of market power.[3] See, e.g., id. at 84 ("monopoly power is the essence of a Sec. 2 violation"); id. at 85 (proof of unlawful conduct "when coupled with proof of monopoly power ... may satisfy the requirement that the attempt [to monopolize] have a 'dangerous probability of success' ") (emphasis added); see also 3 Areeda & Turner p 833d at 341. We see no reason to reject that requirement.
 
 
 19
 Eliminating the dangerous probability element from attempted monopolization would have the effect of extending the coverage of section 2 of the Sherman Act to similar behavior already covered by state and federal law. The Federal Trade Commission Act Sec. 5, 15 U.S.C. Sec. 45 (1982), regulatory statutes and state business tort law all reach anticompetitive behavior by firms that lack market power. Civil RICO may have also expanded into this area. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 486-96, 105 S.Ct. 3280-85, 87 L.Ed.2d 346 (1985) (corporation suing joint venturer for violation of 18 U.S.C. Secs. 1961-68 (1982) need not establish that defendant had been convicted of predicate act and need not prove "racketeering injury"). There is no unmet need calling for judicial expansion of section 2 to reach similar behavior. See 3 Areeda & Turner p 833d at 341.
 
 
 20
 Furthermore, any significant reduction in the antitrust plaintiff's burden of proving that the defendant has a dangerous probability of monopolizing the market might discourage the healthy competition that section 2 is intended to nurture, see id. at 342, and deter businesses from aggressively expanding into new markets. Existing firms that lost market share to a newcomer could seize upon some hiring or marketing tactic, label it "anticompetitive" and then recover treble damages and attorneys' fees. See, e.g., Gerber Products Co. v. Beech-Nut Life Savers, 160 F.Supp. 916, 918 (S.D.N.Y.1958) (plaintiff with 73% share of relevant market for baby food sued defendant with 4.3% share for attempted monopolization, alleging that "puffing" of baby food in glass jars and price reduction to meet plaintiff's price were anticompetitive acts). Surely the potential liability from such a suit would cast a long shadow over business planning.
 
 
 21
 We, therefore, adhere to the traditional rule that an action under section 2 of the Sherman Act for attempting to monopolize a market will lie only where there is anticompetitive conduct, a specific intent to monopolize and a dangerous probability that monopoly will be achieved. A dangerous probability of monopoly may exist where the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct. See 3 Areeda & Turner p 835a at 346.
 
 
 22
 We note that market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power under this standard. Other market characteristics must also be considered in determining whether a given firm has monopoly power or has a dangerous probability of acquiring monopoly power. Cf. Hawk, Attempts to Monopolize--Specific Intent as Antitrust's Ghost in the Machine, 58 Cornell L.Rev. 1121, 1174 (1973) ("The dangerous probability requirement should be retained since it complements the behavioral element of the offense as the vehicle by which the defendant's market power and other structural factors are evaluated."). Among these characteristics are the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand. See Hayden Publishing Co. v. Cox Broadcasting Corp., 730 F.2d 64, 68-69 (2d Cir.1984) (discussing some of these factors); Broadway Delivery Corp. v. United Parcel Service, 651 F.2d 122, 128 (2d Cir.) (same) (citing United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948)), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).
 
 
 23
 Applying this standard, NRT was entitled to a judgment notwithstanding the verdict. See Schwimmer v. Sony Corp. of America, 677 F.2d 946, 951-52 (2d Cir.), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). Viewing the evidence in the light most favorable to IDC, there is only one reasonable conclusion as to the proper verdict. On this record, the jury could not reasonably have found that there was a dangerous probability that NRT would monopolize the market for the carriage of garments on hangers in the Pennsylvania Corridor without engaging in speculation. One year after entering the market, NRT had no more than a seventeen percent share of the carriage of garments on hangers in the Pennsylvania Corridor.[4] Even if NRT drove IDC out of business and took over all of IDC's accounts, NRT would still have a market share of no more than fifty percent. It is unlikely that even with a fifty percent market share NRT could raise prices without losing business to the several other trucking firms that had been unaffected by NRT's employee raids or alleged predatory pricing. The evidence at trial indicated that NRT's 1983 tariffs were already above those of at least three of its other competitors in the Pennsylvania Corridor.
 
 
 24
 Assuming arguendo that NRT could have cannibalized IDC, appropriated all of its customers and obtained sufficient power to raise prices in the market temporarily, the competitors from outside the market could easily have surmounted any barriers to entry and competed with NRT for business in the Pennsylvania Corridor. Although the issue of barriers to entry is disputed, there was undisputed evidence that a new carrier had in fact entered the market during 1983 and that several existing carriers had expanded their operations into the market during 1983 and 1984.
 
 
 25
 This evidence of new entries and expansion is consistent with Department of Justice comments to the Interstate Commerce Commission on January 17, 1983, a certified copy of which was admitted into evidence at trial. The Justice Department observed that entry into the LTL segment of the trucking business requires capital expenditures. It noted, however, that "these capital outlays, though relatively large for the trucking industry, still do not approach the entry costs in other industries." J.App. at 644. The Department went on to note that when existing carriers expand into a new market, they have lower entry costs than new carriers "primarily due to their expertise in the trucking business, their ability to shift some existing assets to new locations at minimal cost, and their ability to use existing terminals or break-bulk stations as the core of an expanded service territory." Id. at 645.
 
 
 26
 Under the conditions in the market for the carriage of garments on hangers in the Pennsylvania Corridor, therefore, NRT's market share was not sufficiently significant to give rise to a dangerous probability that it would monopolize the market even when its anticompetitive conduct is taken into account. A jury could not reasonably find that such a probability existed without engaging in speculation concerning matters not in evidence.
 
 
 27
 Thus, we conclude that IDC failed as a matter of law to establish that NRT, which had at most a seventeen percent market share one year after it entered an intensely competitive market with low entry barriers, had a dangerous probability of successfully monopolizing that market. Our conclusion is supported by the majority of cases with similar facts finding no dangerous probability of a monopoly. Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 270-71 (7th Cir.1981) (30% market share, no significant barriers to entry), cert. denied, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., 614 F.2d 832, 841 (2d Cir.1980) (33% market share, defendant's share continuously declining); Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1368-69 (5th Cir.1976) (20% market share in highly competitive market with low barriers to entry), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); Hiland Dairy, Inc. v. Kroger Co., 402 F.2d 968, 971-72, 974-75 (8th Cir.1968) (20% market share in highly competitive market); cf. United States v. Waste Management, Inc., 743 F.2d 976, 983-84 (2d Cir.1984) (projected 48.8% market share of corporation after proposed merger insufficient to support finding that merger would violate section 7 of the Clayton Act where the barriers to new entry were insubstantial).
 
 B. Conspiracy Claims
 1. Section 1 Claim
 
 28
 To sustain a claim of conspiracy to restrain trade under section 1 of the Sherman Act, IDC must establish (1) that NRT entered into a "contract, combination ... or conspiracy," and (2) that the conspiracy was "in restraint of trade or commerce among the several States." 15 U.S.C. Sec. 1; Oreck Corp. v. Whirlpool Corp., 639 F.2d 75, 78 (2d Cir.1980), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Unlike the proof required to establish a conspiracy to monopolize under section 2, a specific intent to create a monopoly is not required under section 1. At a minimum, however, " 'the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement,' " Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir.) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)), cert. denied, 429 U.S. 885, 97 S.Ct. 235, 50 L.Ed.2d 166 (1976), and that the anticompetitive effects of the alleged conspiracy outweigh its procompetitive effects. National Society of Professional Engineers v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). In this context, it should be emphasized that Congress enacted the Sherman Act to protect competition, not competitors. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).
 
 
 29
 Defendants argue that the evidence before the jury was insufficient as a matter of law to permit an inference of a conspiracy to unreasonably restrain trade.[5] Evidence of a conspiracy should not be "fragmented;" it must be viewed as a whole to determine the reasonableness of inferences drawn by the jury. Matsushita Electric Indus. Co. v. Zenith Radio Corp., --- U.S. ---- - ----, 106 S.Ct. 1348, 1362, 89 L.Ed.2d 538 (1986) (White, J., dissenting) (citing Continental Ore v. Union Carbide & Carbon Co., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)). We must determine, therefore, whether the totality of the evidence, viewed most favorably to the plaintiff, was sufficient to support the jury's verdict. Venture Technology, Inc. v. National Fuel Gas Co., 685 F.2d 41, 45 (2d Cir.), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982), reh'g denied, 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983).
 
 
 30
 The Supreme Court recently reaffirmed that "courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter pro-competitive conduct." Matsushita, --- U.S. at ----, 106 S.Ct. at 1360. We have overturned jury verdicts where, "taken as a whole, the evidence point[ed] with at least as much force toward unilateral actions by [the defendants] as toward conspiracy, and a jury would have to engage in impermissible speculation to reach the latter conclusion." Venture Technology, 685 F.2d at 48. See also Schwimmer v. Sony Corp. of America, 677 F.2d 946, 951-52 (2d Cir.), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982).
 
 
 31
 Affording plaintiff every reasonable inference, the record reveals the following: Francis Walsh, NRT's president, planned to "obliterate" IDC. Walsh intended to hire away IDC's "key" executives to undermine its credibility, initiate a price war to destroy Walsh's "enemy," and then "discharge the executives he seduced" after the enemy was "annihilated." J.App. at 333-34. Plaintiff theorizes that these key executives--defendants Henning, Tice, Weiss, Sabatini and Hannon (hereinafter collectively referred to as "IDC defendants")--knew before being hired by NRT about Walsh's plan to wage a predatory price war and agreed to join in its execution. Although there was no direct evidence of such a pre-employment agreement, plaintiff would infer one from meetings between Walsh and the IDC defendants and their post-employment conduct.
 
 
 32
 In the fall of 1982, the IDC defendants met with Walsh while they were still employed by IDC. IDC defendant Hannon, before and after the meeting, successfully solicited several IDC employees to join NRT. In addition, Hannon and Walsh met several times in the two week period after Hannon had accepted a job with NRT but before he had left IDC. The record also reveals that the other IDC defendants successfully solicited important IDC workers to join NRT, and convinced many substantial IDC customers to switch to NRT. The jury found that IDC incurred substantial losses and that NRT had engaged in predatory pricing.
 
 
 33
 The district judge upheld the jury's finding that defendants engaged in anticompetitive conduct solely by relying on the jury's determination that defendants engaged in predatory pricing. J.App. at 109-10. A careful search of the record reveals no evidence of other anticompetitive conduct. Our inquiry, therefore, is confined to whether there was sufficient evidence that the IDC defendants collaborated in the predatory pricing scheme.
 
 
 34
 Plaintiff produced sufficient evidence to give rise to a reasonable inference that Walsh himself intended to unreasonably restrain trade. That is not enough, however. A section 1 conspiracy requires a plurality of actors agreeing to restrain trade. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767 n. 13, 768, 104 S.Ct. 2731, 2740, n. 13, 81 L.Ed.2d 628 (1984). Taken as a whole, plaintiff's evidence simply does not give rise to a reasonable inference that any of the IDC defendants agreed to assist Walsh in waging a predatory price war, or to do anything else except work for him.
 
 
 35
 The jury's contrary conclusion required impermissible speculation. See Oreck Corp., 639 F.2d at 80 (sheer speculation insufficient to sustain antitrust conspiracy violation). It required the assumption that as of late October 1982, Walsh had agreed with Hannon and/or the other IDC defendants on the details of the scheme to destroy IDC. It required the remarkable assumption that Walsh would disclose details of his predatory pricing war to the IDC defendants while they were still key IDC employees. These assumptions completely lack factual foundation.
 
 
 36
 In reaching this conclusion, we emphasize that the evidence must be evaluated in the context of the pending employer/employee relationships between Walsh and the IDC defendants.[6] The pre-employment meetings between Walsh and the IDC defendants were just as likely held to discuss their future employment relationship as to hatch a predatory pricing scheme.[7] IDC employees testified that they were well aware of the company's financial woes. Thus, the IDC defendants' solicitations of other IDC employees would reflect normal co-worker conversations regarding each other's employment prospects at least as much as they reflect an agreement to unreasonably restrain trade. See Matsushita, --- U.S. at ---- - ----, ----, 106 S.Ct. at 1355-58, 1362 (purely equivocal evidence does not give rise to an inference of illegal conspiracy). The IDC defendants' solicitations of IDC employees after having left IDC's employ, as well as their practice of "stealing IDC's customers" also after leaving IDC, reflect nothing more than effective performance of their duties as NRT employees. See Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc., 735 F.2d 884, 894 (5th Cir.1984) (not anticompetitive to hire away competitor's employees who use "own skills and contacts ... to generate business for [their] new employer, even at the expense of [their] old employer"). Ultimately, the salient point remains that plaintiff did not offer a scintilla of evidence that any of the IDC defendants knew of or participated in the predatory pricing scheme.
 
 
 37
 Plaintiff, therefore, failed to produce proof which is not "as consistent with permissible competition as with illegal conspiracy." Matsushita, --- U.S. at ----, 106 S.Ct. at 1357. We reverse the district court's denial of defendants' motion for judgment notwithstanding the verdict with respect to the section 1 claim.
 
 2. Section 2 Claim
 
 38
 Section 2 expressly prohibits individuals from "combin[ing] or conspir[ing] with any other person or persons, to monopolize...." 15 U.S.C. Sec. 2. The elements of a conspiracy to monopolize are "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy."[8] Paralegal Institute, Inc. v. American Bar Ass'n, 475 F.Supp. 1123, 1132 (E.D.N.Y.1979), aff'd mem., 622 F.2d 575 (2d Cir.1980). See Northeastern Telephone, 651 F.2d at 85 (citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)) ("The essence of [a conspiracy to monopolize] is an agreement entered into with the specific intent of achieving monopoly....").
 
 
 39
 Defendants argue that the evidence was insufficient as a matter of law to permit an inference of a conspiracy to monopolize. The corpus of evidence from which the jury might have drawn such an inference is presented in Part B(1), supra. We conclude that any implication drawn from such evidence that the IDC defendants harbored the proscribed intent to monopolize must rest on the same impermissible speculation that flawed the jury's finding of a conspiracy to restrain trade. Plaintiff's theory fails because it does not reasonably establish that any individual defendant except Walsh intended to create a monopoly; a plurality of actors sharing such an intent is required under section 2. See Northeastern Telephone, 651 F.2d at 85. We, therefore, reverse the district court's denial of defendants' motion for judgment notwithstanding the jury's verdict with respect to the section 2 claim.
 
 
 40
 The judgment of the district court is reversed and the case is remanded to the district court for entry of judgment in favor of defendants.
 
 
 
 [1]
 NRT also operated as a "truckload" or "line haul" carrier, carrying full truckloads from the shipper's place of business to the final destination. This case only concerns NRT's less-than-truckload operations
 This opinion refers to IDC and NRT in the present tense even though the record and the appellate briefs indicate that both firms have begun proceedings under Chapter 11 of the Bankruptcy Code. On January 9, 1987, the United States Bankruptcy Court for the District of New Jersey, Gindin, J., modified, effective September 6, 1985, the automatic stay as it extends to Walsh and the corporate defendants for purposes of permitting the continued prosecution of this appeal. The automatic stay resulting from IDC's petition does not affect our jurisdiction because, as to IDC, this appeal is not a proceeding "against the debtor" within the meaning of section 362. Commerzanstalt v. Telewide Systems, Inc., 790 F.2d 206, 207 (2d Cir.1986) (per curiam).
 
 
 [2]
 As a result, we need not inquire whether (1) IDC had the burden of proving that NRT's prices were below NRT's reasonably anticipated marginal costs, or (2) NRT had the burden of rebutting IDC's proof that NRT's prices were below NRT's average variable costs by coming forward with evidence that those prices were above NRT's reasonably anticipated marginal costs. Compare Br. of Defendants-Appellants at 40-44 with Br. of Plaintiff-Appellee at 26-27 & n. 15
 
 
 [3]
 "Market power" is a synonym for "monopoly power." We have previously defined "monopoly power" as "the power to control prices or exclude competition ... in the relevant market." Broadway Delivery Corp. v. United Parcel Service, Inc., 651 F.2d 122, 126-27 (2d Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981)
 
 
 [4]
 NRT maintains that it only had 10% of the market. IDC maintains that NRT's market share was closer to 17%. NRT hypothesizes that IDC still had a 33% share of the market in 1984. The record is unclear as to whether either party presented market share calculations to the district court, but both IDC and NRT have used evidence that was properly admitted at trial to make the calculations contained in their appellate briefs and we rely on those calculations. Viewing the evidence in the light most favorable to the verdict, we assume that IDC established that NRT enjoyed a 17% market share in 1984
 
 
 [5]
 We note as a preliminary matter that any conspiracy relevant here would have had to begin before Walsh and NRT hired defendants Henning, Tice, Weiss, Sabatini or Hannon. Once these defendants and Walsh became "officers or employees of the same firm[, they could] not provide the plurality of actors imperative for a Sec. 1 conspiracy." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984) (citing, inter alia, Schwimmer, 677 F.2d at 953). After joining NRT, any concerted activity between any of these defendants and Walsh could not "represent a sudden joining of two independent sources of economic power previously pursuing separate interests ... that warrants Sec. 1 scrutiny." Copperweld, 467 U.S. at 771, 104 S.Ct. at 2742
 
 
 [6]
 As a general policy matter, one firm's hiring of its competitor's employees does not present a "compelling case for antitrust intervention." 3 P. Areeda & D. Turner, Antitrust Law, Sec. 702b at 109 (1978) (referring to monopolist's hiring of competitor's employees). A contrary analysis might constrict the freedom of employees to reap the full benefits of their abilities by discouraging them from moving to the employer offering the highest compensation, as well as by discouraging employers from bidding on a competitor's employees. Id
 
 
 [7]
 Our conclusion might be altered had the IDC defendants misappropriated trade secrets from IDC in the course of working for NRT. The jury, however, found that IDC possessed no such trade secrets
 
 
 [8]
 The trial judge instructed the jury that "the elements of [conspiracy to monopolize] are essentially the same for [the elements of] an attempt to monopolize ... with the additional proof of a conspiracy to achieve that purpose...." J.App. at 2221-22. Unlike the elements required to establish an attempt to monopolize, however, proof of a conspiracy to monopolize does not require a dangerous probability of success. American Tobacco Co. v. United States, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946); United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir.1961); Reborn Enterprises, Inc. v. Fine Child, Inc., 590 F.Supp. 1423, 1451 (S.D.N.Y.1984), aff'd per curiam, 754 F.2d 1072 (2d Cir.1985). See also Terry's Floor Fashions v. Burlington Industries, 568 F.Supp. 205, 215 (E.D.N.C.1983), aff'd, 763 F.2d 604, 606 n. 1, 615 (4th Cir.1985), Bonjorno v. Kaiser Aluminum & Chemical Co., 752 F.2d 802, 811 n. 3 (3d Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986); Von Kalinowski, 3 Antitrust Laws and Trade Regulation Sec. 9.02 at 9-35 (1986)
 Courts have confused the elements of conspiracy to monopolize with those of attempt to monopolize. See, e.g., Levitch v. Columbia Broadcasting System, Inc., 495 F.Supp. 649, 668 (S.D.N.Y.1980) (conspiracy to monopolize, like attempt to monopolize, requires dangerous probability of success), aff'd, 697 F.2d 495, 496 (2d Cir.1983); Kreager v. General Electric Co., 497 F.2d 468, 471 (2d Cir.) (same), cert. denied, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974). See also V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc., 403 F.Supp. 643, 651-53 & n. 11 (E.D.Pa.1975) (treating all violations of Sherman Act Sec. 2, including conspiracy to monopolize, as requiring a showing of dangerous probability of success), aff'd mem., 565 F.2d 154 (3d Cir.1977). Indeed, the Supreme Court has recognized that the elements of an attempt to monopolize are subject to confusion with those of a conspiracy to monopolize. Continental Ore Co. v. Union Carbide, 370 U.S. 690, 709, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962). See Von Kalinowski, supra, Sec. 9.02 at 9-33 & n. 4 (listing cases which confuse elements of attempt to monopolize and conspiracy to monopolize by requiring dangerous probability of success in both).
 Congress outlawed the conspiracy itself. Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913). Once a plaintiff establishes a conspiracy with a specific intent to monopolize, proof of success or impending success is irrelevant American Tobacco Co. v. United States, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946) ("[i]t has long been settled ... [that defendants] might have been convicted here of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy"); United States v. Griffith, 334 U.S. 100, 107 n. 9, 68 S.Ct. 941, 945 n. 9, 92 L.Ed. 1236 (1948) (same). See Copperweld, 467 U.S. at 767-71 & n. 13, 104 S.Ct. at 2740-41 & n. 13 (explaining Congress' intent and rationale for treating conspiratorial conduct more harshly than unilateral conduct).
 A major concern underlying antitrust jurisprudence lies in the fear of mistakenly attaching antitrust liability to conduct that in reality is the competitive activity the Sherman Act seeks to protect. See Part A, supra; Handler, Reforming the Antitrust Laws, 82 Colum.L.Rev. 1287, 1352-53 (1982). In this context, we note that proof problems regarding antitrust conspiracies are remedied by the close judicial scrutiny applied to evidence of their existence. Cf. Matsushita, --- U.S. at ---- 106 S.Ct. at 1355-58 (antitrust law limits the range of permissible inferences of conspiracy from ambiguous evidence); Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 763-64, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) (same). Attempted monopoly, however, implicates proof problems which partly explain our requirement that plaintiffs establish a dangerous probability of success under this section 2 offense. See Part A, supra; Handler, supra, at 1352-53 (dangerous probability element in attempted monopoly cases "assur[es] that aggressive single-firm conduct will not be attacked as attempted monopolization," id. at 1353; assures that procompetitive conduct will not be chilled by antitrust laws). Conspiracy to monopolize, therefore, differs from attempt to monopolize in at least one respect critical to our imposition of the additional element of a dangerous probability of success.