**THE SAMPLE INC., Plaintiff,**

v.

**PENDLETON WOOLEN MILLS, INC., Defendant.**

**No. 86 CIV. 2230(LBS).**

United States District Court, S.D. New York.

Jan. 23, 1989.

Wisehart & Koch, New York City (Arthur M. Wisehart, Paula C. Rowe, Kirk L. Bigelow, Dennis O'Neil Cowling, of counsel), for plaintiff.

Schnader, Harrison, Segal & Lewis, New York City (Barry Simon, of counsel), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, Or. (Wayne Hilliard, Marianne Schimelfenig, of counsel), for defendant.

## OPINION

SAND, District Judge.

Plaintiff The Sample Inc. ("The Sample"), a retailer of men's and women's apparel with stores in upper New York State, sued Pendleton Woolen Mills, Inc. ("Pendleton"), a manufacturer of woolen clothing and goods, alleging violations of 15 U.S.C. §§ 1 and 2 ("Sherman Act"), N.Y.Gen. Bus.Law § 340 (McKinney 1988) ("Donnelly Act"), and common law fraud. The case is before this Court now on defendant's motions for summary judgment and to strike affidavits and plaintiff's cross-motion for sanctions.

*Facts*

Pendleton is known as a manufacturer of quality men's and women's apparel. Pendleton sells its products, which consist mainly of woolen goods, through sales representatives who have exclusive territories throughout the United States. Pendleton sells its goods to several retail stores in the Buffalo area, including Adam, Meldrum & Anderson ("AM & A"), L.L. Berger, Jenss, and Sibley's. Until 1985, The Sample, a retailer with stores in the Buffalo area, had also purchased goods, mainly womenswear, from Pendleton.

On January 3, 1985, C.M. Bishop, III, Pendleton's National Womenswear Sales Manager, advised Maer Bunis, co-owner and chief executive officer of The Sample that Pendleton would no longer be selling to The Sample. Pendleton claims that the decision was based on Pendleton sales representative Mort Madden's recommendation to Mr. Bishop, III that Pendleton had too many accounts in the Buffalo area. Memorandum in Support of Defendant's Motion for Summary Judgment at 5. Pendleton describes its decision to terminate its account with The Sample as "a unilateral decision," which it made without consulting any of the other accounts in the Buffalo area. *Id.* Pendleton asserts that "the pricing policies of The Sample were not a consideration in the decision to terminate the store as an account." *Id.* at n. 3.

The Sample attributes its termination as a Pendleton account to its discount or promotional pricing. The Sample claims that it was terminated in furtherance of a conspiracy that involved both Pendleton sales representatives and other retail stores and through which Pendleton sought to maintain the sale of Pendleton merchandise at "regular" or "keystone" prices.[1] According to The Sample, Pendleton's "Profitability Plan"[2] served as a device by which the Pendleton sales representative could approach the retail store and elicit an agreement to sell Pendleton merchandise at keystone prices. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 9. The Sample asserts that because it sold below keystone price, it received from Pendleton less popular lines of clothing and fewer "off-price" deals than "traditional" retailers willing to sell at keystone prices, until finally, it was terminated as a Pendleton account. After termination, The Sample filed this suit and charged Pendleton with violations of state and federal antitrust laws and common law fraud.

*Discussion*

At the center of the dispute between Pendleton and The Sample is The Sample's charge that Pendleton violated § 1 of the Sherman Act. Section 1 makes illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The existence of a "contract, combination, or conspiracy" is a prerequisite for a section 1 claim. *H.L. Hayden Co. v. Siemens Medical Systems,* 672 F.Supp. 724, 731 (S.D.N.Y.1987).

A "contract, combination or conspiracy" requires "concerted action of more than a single entity." *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1152 (9th Cir. 1988). Courts distinguish between concerted and independent (unilateral) action; the latter is not unlawful under section 1 of the Sherman Act, whereas the former is regarded as *per se* illegal and subject to treble damages. *Monsanto Co. v. Spray-Rite Service Corp.* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984).

■ The Supreme Court has explained that the distinction between concerted and

---

**1.** Keystone pricing is "understood by all in the apparel trade to mean a markup of 50% of the retail price, or twice the wholesale cost." Plaintiff's Appendix ("App.") at 15 (Aff't of Maer Bunis ¶ 30) (Sept. 7, 1988).

**2.** The Profitability Plan, which will be discussed *infra* at p. 503, is contained in the Pendleton Advantage, a book provided by Pendleton to its sales representatives and retailers. The book describes the Pendleton philosophy and offers advice on the best way to market Pendleton products.

independent action is useful because a manufacturer has a right to deal, or refuse to deal, with a distributor, as long as it does so independently. *Monsanto, supra,* 465 U.S. at 761, 104 S.Ct. at 1469 (citing *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). Similarly, a distributor can decide to conform to a manufacturer's suggested price to avoid termination. To deter such communication about prices between manufacturer and distributor would result in dislocations in the market. Manufacturers need to know about how their products are received and need to develop strategies that will enhance their reception. *Monsanto, supra,* 465 U.S. at 763–64, 104 S.Ct. at 1470–71. A plaintiff alleging a vertical price-fixing arrangement must make a showing of concerted action. To require less would " 'inhibit management's exercise of its independent business judgment and emasculate the terms of the statute.' " *Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 n. 2 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).

■ The standard for summary judgment places the burden on the moving party, in this case Pendleton, to show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Given the threshold question of the existence of a conspiracy, Pendleton must show that the facts alleging a conspiracy are "not susceptible of the interpretation" The Sample sets forth in its complaint. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). If that burden is met, The Sample must show proof of the conspiracy and that it suffered "cognizable injury" as a result of the conspiracy. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574,

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although inferences must be drawn in favor of the nonmoving party, *id.* at 587, 106 S.Ct. at 1356, the Supreme Court has said that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Id.* at 588, 106 S.Ct. at 1357. Applying the above standard to the facts of this case, we believe that summary judgment is appropriate.

Pendleton explains its decision to terminate The Sample based upon its Buffalo sales representative's assessment that Pendleton was selling to too many stores in the Buffalo area. Defendant's App. at 25a (Aff't of C.M. Bishop III ¶ 3) (June 13, 1988); Defendant's App. at 33a (Aff't of Mort Madden ¶ 2) (June 9, 1988). Pendleton management had determined that its line was most successful in stores that were willing to carry a full array of its products, educate its salespeople about Pendleton products, and display the Pendleton line separately from those of other manufacturers. Defendant's App. at 142a–43a (The Pendleton Advantage). Accordingly, Pendleton decided to focus its sales on a fewer number of stores that could provide Pendleton with the range of services it considered necessary for success. *Id.* The Sample did not provide such services.

In addition, prior to its termination, The Sample had not been entirely successful in its sale of Pendleton products.[3] As the Supreme Court recognized in *Monsanto,* a manufacturer, as part of its marketing strategy, "often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product." *Monsanto Co., supra,* 465 U.S. at 762–63, 104 S.Ct. at 1470. These are legitimate business concerns for a manufacturer to have.

For The Sample to avoid summary judgment on its price-fixing claim, it must advance sufficient evidence to raise a genuine

---

**3.** In fact, when Pendleton notified Maer Bunis of The Sample that its account would be terminated, Bunis wrote a note at the top of the letter: "Shall we thank them or fight them?" The comment reinforces Pendleton's contention that The Sample had been less successful than it had anticipated in selling the Pendleton line. Defendant's App. at 61a (Bunis Depos.) (Nov. 30, 1987). Mr. Bunis explained that he might have written that comment because The Sample had not been "as profitable as we would like to have been." *Id.* at 59a.

dispute as to whether Pendleton was involved in a vertical, price-fixing scheme. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 923 (2d Cir.1985) (antitrust plaintiff opposing summary judgment motion may not rest on "conclusory assertions of conspiracy" after defendant has provided "substantial evidence supporting a plausible and legitimate explanation of [its] conduct"). The Sample cannot rest on allegations of conspiracy as set forth in its complaint, but must present evidence such that a jury could find "that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). The Sample must show not merely that retailers conformed to Pendleton's suggested prices, but rather that the retailer "communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Monsanto Co., supra,* 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9.

■ The first hurdle that The Sample must overcome in its effort to provide sufficient evidence for a reasonable jury to infer a conspiracy is to identify the separate entities with which Pendleton is alleged to have conspired. The Sample charges that Pendleton conspired with its sales representatives, but this claim must fail because the sales representatives act as agents for Pendleton, rather than as separate entities. Just as the Supreme Court has said that a parent and its wholly-owned subsidiary cannot be said to conspire for purposes of § 1, *see Copperweld Corp. v. Independence Tube Corp,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984), and the Second Circuit

has said that a manufacturer and its sales agents cannot be said to conspire (assuming the sales agents have limited authority), *see Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1031 n. 5 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979) [4] so, too, Pendleton and its sales representatives cannot be said to conspire. Pendleton's sales representatives do not set prices for the products or take possession of them. They do not do any more than secure an order for Pendleton products from a retailer. What Judge Neaher said about the alleged conspiracy by the Post in *Person v. New York Post Corp.*, 427 F.Supp. 1297, 1307 (E.D.N.Y.), *aff'd mem.*, 573 F. 2d 1294 (2d Cir. 1977), is equally apt here: "To the extent that plaintiffs' theory of concerted activity is that the Post conspired with its own ... agents ..., their § 1 claim may not be maintained, for, as a matter of law, the Post would then be conspiring with itself to perform a single, unilateral act."

■ The Sample also alleges that Pendleton conspired with other retail stores in the Buffalo area to maintain keystone prices. However, it asks the Court to draw this conclusion from impermissible inferences. In support of its conspiracy claim, The Sample points to the following: sharing of pricing information between Pendleton and traditional retailers in the Buffalo area (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 35); complaints from traditional retailers about The Sample's discount prices (*id.* at 47); and success in Pendleton's gross margins that could not have been achieved without a conspiracy (*id.* at 49). As the Supreme Court made clear in *Monsanto Co.,* manufacturers have legitimate reasons for sharing information with distributors, *see* 465 U.S. at 762, 104 S.Ct. at 1470, and evidence of complaints is

---

4. According to the Second Circuit, to determine whether principal and agent constitute one or two entities, we need to examine:

whether the agent performs a function on behalf of his principal other than securing an offer from a buyer for the principal's product; the degree to which the agent is authorized to exercise his discretion concerning the price and terms under which the principal's product is to be sold; and finally whether use of the agent constitutes a separate step in the vertical distribution of the principal's product. *Id.*

not sufficient to establish a conspiracy.[5] *Id.* at 763–64, 104 S.Ct. at 1470; *see H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Reborn Enterprises, Inc. v. Fine Child, Inc.*, 590 F.Supp. 1423, 1438 (S.D.N.Y.1984), *aff'd*, 754 F.2d 1072 (2d Cir.1985). Indeed, the Supreme Court advises that "something more than evidence of complaints is needed." *Monsanto Co., supra*, 465 U.S. at 764, 104 S.Ct. at 1471.

The "something more" that The Sample provides falls under the Supreme Court's heading of "arguably more ambiguous" evidence, and will not, on its own, constitute sufficient evidence of conspiracy. *Id.* at 765, 104 S.Ct. at 1471. According to the Supreme Court, "there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 768, 104 S.Ct. at 1473. Neither Pendleton's Profitability Plan nor its successful sales in 1984 provide such direct or circumstantial evidence.

The Pendleton Profitability Plan ("Plan") is intended to assist the retailer in marketing the Pendleton line as successfully as possible. The Plan offers advice to the retailer. For example, it suggests trying to sell ensembles, ordering a full collection of Pendleton lines, presenting Pendleton separately from other lines, and devoting resources to the training of salespeople. The Plan includes samples of the kind of advertisements that Pendleton provides, as well as an array of aids available to the retail store from Pendleton (display posters, counter cards, and training films). Although The Sample seizes upon this Plan as evidence of a conspiracy, we find such a conclusion to be unsupported. The Sample

focuses on the Plan's use of the word "commitment" as evidence of an agreement and on the statement "[a]ll Pendleton customers should be profitable with Pendleton at regular price" as evidence of coercion to sell at keystone price. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 37–38. But as the court said in *Reborn* where the manufacturer was engaged in distributing a suggested retail price list, which is far more explicit about pricing than the Pendleton Plan, "[p]ublication of a suggested retail price list, ... and voluntary adherence to it by plaintiff's competitors, is insufficient to support a finding of a vertical price fixing conspiracy." *Reborn, supra*, 590 F.Supp. at 1439. Moreover, even if Pendleton were trying to pressure retailers to sell at keystone price, the Pendleton Plan hardly constitutes "coercion," which is the level to which such pressure would have to rise to constitute evidence sufficient to establish a conspiracy. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 53 (2d Cir.1980). As the court said in *Reborn*, "exposition, persuasion, argument, or pressure, ... are alone insufficient to establish coercion." *Reborn, supra*, 590 F.Supp. at 1440.

Even if Pendleton's Plan could be said to constitute coercion, The Sample has nonetheless failed to show any agreement by retailers to abide by keystone prices. As the court said in *The Jeanery, Inc.*, "[a] plaintiff does not establish concerted action ... merely by proving that the defendant sought agreement. More is required." 849 F.2d at 1160. The Supreme Court explained that "evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Monsanto Co., supra*, 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9. The Sample has failed

---

**5.** Moreover, The Sample's evidence of complaints is ambiguous at best. There is evidence that complaints were registered with Pendleton, but it is unclear about which stores these complaints were made. Madden recalled initially that "Jenss' complained about Sibley's running a three-day coupon sale. And L.L. Berger complained about Sample running a three-day cou-

pon sale." Plaintiff's App. (Madden Depos. 256–57) (Mar. 27, 1987). However, Madden later said in a supplemental affidavit that he was actually recalling "an L.L. Berger complaint about *Sibley's*, not The Sample." Defendant's Reply App. at 20sa (Madden Aff't ¶ 3) (Oct. 18, 1988).

to make such a showing.[6]

The Sample, like the parties alleging conspiracies in *Reborn* and *Burlington Coat Factory,* has failed to produce evidence that would "permit a reasonable jury to find a vertical price-fixing scheme." [7] *Reborn, supra,* 590 F.Supp. at 1440. Plaintiff has "patched together a quilt of speculation to support its section 1 claims," *H.L. Hayden, supra,* 672 F.Supp. at 740, largely by submitting affidavits, depositions and exhibits of former Pendleton employees who see a conspiracy as responsible for their discharge from the company. Plaintiff has not met its burden, and defendant's motion for summary judgment as to plaintiff's § 1 claim is granted.

■ The Sample makes a halfhearted attempt to allege a violation of § 2 of the Sherman Act,[8] and as to this claim too, summary judgment is appropriate. Section 2 of the Sherman Act prohibits monopolizing, attempting to monopolize, or conspiring to monopolize any part of interstate trade. 15 U.S.C. § 2.

The Supreme Court has said that a § 2 monopoly requires: monopoly power in the relevant market; and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident[,]" *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), while the Second Circuit has said that an attempt to monopolize claim requires a showing of: anticompetitive or exclusionary conduct; specific intent to monopolize; and a "dangerous probability" that the attempt will be successful. *Inter-*

*national Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 790 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). The Sample has provided no substantive evidence, either direct or circumstantial, that would lead to a reasonable inference that Pendleton possessed monopoly power or engaged in anticompetitive conduct, had an intent to monopolize, and possessed the relevant market share to succeed. In fact, The Sample makes no claims as to Pendleton's market share, other than to assert that Pendleton is unique and its products constitute the entire market. However, The Sample, like Reborn, " 'bears the burden of proving the boundaries of the relevant market,' yet it has failed even to allege facts which might identify this market." *Reborn, supra,* 590 F.Supp. at 1451 (quoting *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980)); *see also International Distribution Centers, supra,* 812 F.2d at 792 (market share analysis is "essential"). Here, as in *Reborn,* plaintiff has failed to identify evidence from which a reasonable jury might conclude that defendant achieved or attempted to achieve a monopoly in the relevant market, and accordingly, summary judgment is appropriate.

The Sample's allegation of conspiracy to monopolize is also without merit. The Second Circuit has described the " 'essence' " of a § 2 claim of conspiring to monopolize as " 'an agreement entered into with the specific intent of achieving monopoly.' " *Belfiore v. New York Times Co.,* 826 F.2d 177, 183 (2d Cir.1987) (quoting *Northeastern Telephone Co. v. American Telephone*

---

**6.** The Sample also asks the Court to infer a conspiracy based upon "[t]he dramatic rise in the gross margins of cooperating retailers the *first year* the Plan was in effect." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 35. However, a rise in gross margins is not necessarily the result of a conspiracy. There could be other factors at work. This court, just as the court in *H.L. Hayden,* cannot "make grand leaps of faith.... We are not willing to engage in such intellectual gymnastics." 672 F.Supp. at 739.

**7.** Having found insufficient evidence that would allow a reasonable jury to infer the existence of

a conspiracy, we need not reach the issue of cognizable injury.

**8.** The Sample refers to a § 2 claim, without actually pleading it as a separate cause of action in its complaint. *See* Complaint ¶ 33. In *Person, supra,* 427 F.Supp. at 1308, the court found a § 2 claim "raised solely by inference" to be "insufficient" and "thus manifestly without merit." In *H.L. Hayden, supra,* 672 F.Supp. at 740, the court recognized that the § 2 claim was a "perfunctory add-on in a section 2 refusal-to-deal case" and found the claim to be without merit. We make the same finding here.

*& Telegraph Co.,* 651 F.2d 76, 85 (2d Cir. 1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982)), *cert. denied,* — U.S. ——, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988). The elements of a conspiracy to monopolize are: " '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.' " *International Distribution Centers, Inc., supra,* 812 F.2d at 795 (quoting *Paralegal Institute, Inc. v. American Bar Ass'n,* 475 F.Supp. 1123, 1132 (E.D.N.Y.1979)), *aff'd mem.,* 622 F.2d 575 (2d Cir.1980). The Sample has not provided any additional evidence to sustain its assertion of a conspiracy to monopolize. Apparently, it rests on the evidence it provided to allege a conspiracy to restrain trade, which this court has found insufficient, and it offers no evidence as to intent. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 58. Accordingly, defendant's motion for summary judgment is granted as to this allegation as well.

In addition to its federal antitrust claims, The Sample alleges violations of the Donnelly Act, N.Y.Gen.Bus.Law § 340, which is the state counterpart to the Sherman Act. Although plaintiffs assert that the Donnelly Act is broad in scope, the threshold showing, as in a § 1 Sherman Act claim, is "evidence of a 'contract, agreement, arrangement, or combination.' " *H.L. Hayden Co. v. Siemens Medical Systems,* 672 F.Supp. 724, 745 (S.D.N.Y.1987). The Sample has failed to make this threshold showing, and we conclude, as did Judge Goettel in *H.L. Hayden,* that just as plaintiff has not offered evidence sufficient to draw a reasonable inference of conspiracy under the Sherman Act, so too, has plaintiff failed to make the requisite showing under the Donnelly Act. *Id.* Accordingly, defendant's motion for summary judgment as to this claim is granted.[9]

The Sample's final cause of action is one for fraudulent misrepresentation. The Sample claims that Pendleton represented to it that its account "would not be terminated without good cause" Defendant's App. at 12a (Complaint ¶ 38), and that Pendleton would adhere to the terms of the Consent Order that it had entered into with the Federal Trade Commission ("FTC"). *Id.* at ¶ 40.

Under New York law, the elements of fraud, each of which must be proven by clear and convincing evidence, are: representation of a material fact, falsity of the representation, scienter, reliance, and injury. *See, e.g., Westbury Small Business Corp. v. Ballarine,* 128 Misc.2d 469, 489 N.Y.S.2d 815 (Nassau County Sup.Ct.1985), *aff'd,* 125 A.D.2d 462, 509 N.Y.S.2d 569 (2d Dep't 1986). On defendant's motion for summary judgment, plaintiff has the burden of providing sufficient evidence that would allow a reasonable jury to find, by clear and convincing evidence, that each of the elements of fraud has been met. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) ("clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions"). The Sample has failed to provide such evidence.

▮ The Sample alleges that it relied upon Pendleton's advertisements about "relationships that last a lifetime" to conclude that its account would not be terminated without good cause. Plaintiff's App. at 1 (Aff't of Maer Bunis ¶ 24) (Sept. 7, 1988).[10] However, Pendleton's advertisements appeared in trade publications two years prior to The Sample's account with Pendleton, and in any case, they fall under the category of "puffing" and cannot be reasonably relied upon as a statement of Pendleton's obligations. *See, e.g., Simon v. Cunard Line Ltd.,* 75 A.D.2d 283, 428 N.Y.S.2d 952 (1st Dep't 1980). In fact, in his deposition,

---

**9.** Although this court has already disposed of the federal antitrust claims raised by plaintiff, the state law claim is properly before this Court by virtue of the parties' diversity jurisdiction.

**10.** Other statements that appeared in similar advertisements described Pendleton as: "a place where value still counts"; "a place where people can be counted on"; and "a place where people still take pride." Plaintiff's App. of Exh. at 61, 63, 65.

Mr. Bunis, chief executive officer of The Sample, conceded that Pendleton did not make any such representations to him, or to his knowledge, to anyone else at The Sample. Defendant's App. at 65a–67a (Bunis Depos. 222–24) (Nov. 30, 1987).

■ The Sample also alleges that it relied on Pendleton's representation that it would adhere to the Consent Order and not discriminate against accounts selling below keystone price. However, even if the Consent Order (Defendant's App. at 133a–36a), or the letter Pendleton sent to its retail stores advising them that it would adhere to the Order (Defendant's App. at 42a, 137a), constituted a representation, The Sample has failed to show that the representation contained in the Order and letter was false at the time it was made; that Pendleton knew it was false; that The Sample relied on this representation and that it suffered injury as a result. In fact, in another deposition, Mr. Bunis admitted that The Sample determined its prices of Pendleton's womenswear based on market conditions, and that it did not change its prices in any way as a result of the Consent Order or letter. Defendant's App. at 53a–55a (Bunis Depos. 21–23) (Feb. 26, 1987). At the very least, The Sample has failed to demonstrate reliance, and its references to a "surreptitious scheme" hardly constitute clear and convincing evidence that would allow a reasonable jury to decide that the representation was false and that Pendleton had knowledge of its falsity. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 65. Accordingly, defendant's motion for summary judgment as to plaintiff's claim of fraudulent misrepresentation is granted.

This case is also before the Court on Pendleton's motion to strike the affidavits and The Sample's cross-motion for sanctions. Pendleton made its motion to strike affidavits "in order to preclude their consideration by the District Court and to prevent waiver of the issue on appeal." Memorandum in Support of Defendant's Motion To Strike Affidavits at 2. However, given this Court's decision to grant Pendleton's motion for summary judgment, we need not consider its motion to strike. After having reviewed all of The Sample's affidavits, (including those objected to by Pendleton), as well as The Sample's other submissions, this Court has found the evidence insufficient to withstand a motion for summary judgment. Accordingly, Pendleton's motion to strike is now academic and does not require a ruling from this Court.

Although the Court need not rule on Pendleton's motion to strike affidavits, The Sample's cross-motion for sanctions, filed in response, is without merit. Pendleton's motion to strike does not meet the standards for sanctions set forth in Fed.R. Civ.P. 11 or 28 U.S.C. § 1927. Pendleton's motion is neither frivolous nor designed to add unnecessarily to the length or cost of the litigation. Accordingly, The Sample's cross-motion for sanctions is denied.

For all of the reasons stated above, the complaint is dismissed.

SO ORDERED.