**SNCB CORPORATE FINANCE LIMITED, Plaintiff,**

v.

**Eugene Ivan SCHUSTER and Venture Funding, Ltd., Defendants.**

**No. 93 Civ. 0687 (LLS).**

United States District Court, S.D. New York.

Sept. 29, 1994.

Hill, Betts & Nash (Martin Domb, of counsel), New York City, for plaintiff.

Morganroth & Morganroth (Mayer Morganroth, of counsel), New York City, for defendants.

## OPINION AND ORDER

STANTON, District Judge.

Plaintiff moves pursuant to Fed.R.Civ.P. 56 for summary judgment.

## BACKGROUND

Plaintiff SNCB Corporate Finance Limited ("SNCB") seeks to enforce two guarantees made with respect to a working capital facility (the "Facility") extended in 1990 by the London branch of the National Commercial Bank ("NCB") to American Monitor (UK) Limited ("AMUK"), an English company.[1] Plaintiff claims that defendants guaranteed AMUK's obligations under the Facility, then refused to pay after AMUK defaulted and NCB demanded payment. Defendants assert defenses of fraudulent inducement, commercial unreasonableness and NCB's wilful misconduct.

### 1. The Agreements

In August 1990, NCB and AMUK entered into the Facility, pursuant to which NCB agreed to provide loans or issue bonds, indemnities or guarantees up to a maximum aggregate amount of £700,000. (Pl.'s Ex. 1, cl. 2(e).) In addition to imposing a £700,000 cap on advances, the Facility's borrowing formula limited the aggregate principal amount outstanding to 85% of specified accounts receivable plus 85% of certain inventory. (Pl.'s Ex. 1, cl. 2(e); Penny Aff., ¶ 6.)

NCB also agreed to issue, at AMUK's request, a duty deferment guarantee guaranteeing payment of value added taxes and import duties incurred by AMUK. (Pl.'s Ex.

---

**1.** Effective December 18, 1992, NCB, a Saudi Arabian bank, assigned all of its rights with respect to the loan and guarantees at issue in this case to SNCB, a wholly-owned subsidiary of NCB. (Penny Aff., ¶ 3; Pl.'s Ex. 22.)

1, cl. 2(c); Penny Aff., ¶ 7.) The Facility irrevocably authorized NCB to pay amounts demanded from it in connection with the duty deferment guarantee, required AMUK to indemnify NCB for any amounts paid, and authorized NCB to debit to AMUK's account any amounts payable under the indemnity. (Pl.'s Ex. 1, cl. 2(d).)

As security for the loans contemplated by the Facility, the parties entered into the Debenture, by which AMUK granted NCB a security interest in all of AMUK's assets (Pl.'s Ex. 2, cl. 3.01), the right to appoint a receiver in the event of AMUK's default, (Pl.'s Ex. 2, cls. 8.01, 8.02) and provided that AMUK's failure "to pay or to discharge any of its Secured Obligations or . . . to comply with any term or condition" of the Debenture would constitute a default. (Pl.'s Ex. 2, Schedule 3, ¶ 1.) Schedule 2 to the Debenture set forth the receiver's powers, which included selling the secured assets at a public or private sale. (Pl.'s Ex. 2, Schedule 2, cl. 4.) The parties agreed that the Debenture would be governed and interpreted in accordance with English law. (Pl.'s Ex. 2, cl. 16.01.)

As a condition of the Facility, defendants [2] executed separate guarantees (the "1990 Guarantees" or "Guarantees") of AMUK's obligations. (Pl.'s Exs. 3 and 4; Penny Aff., ¶¶ 10–12.) Both Guarantees provided that defendants "unconditionally and irrevocably" guaranteed payment of AMUK's obligations to NCB when due. Defendants waived all rights of objection and defenses other than fraud or "NCB's willful misconduct causing defendants material harm." (Pl.'s Exs. 3 and 4, cl. 2.1.) NCB could renew, vary, determine or increase any accommodation or credit given to AMUK without affecting defendants' liability under the Guarantees. (Pl.'s Exs. 3 and 4, cl. 6(a).) The Guarantees provided that New York law would govern the Guarantees. (Pl.'s Ex. 3, cl. 14; Pl.'s Ex. 4, cl. 15.)

## 2. The Side Letter Extension

The Facility expired by its terms on June 30, 1991. (Pl.'s Ex. 1, cl. 8.) In late May 1991, AMUK requested that NCB extend the Facility for an additional year, increase the maximum amount to £1,250,000, and provide an additional term loan of £250,000. (Pl.'s Ex. 6; Penny Aff. ¶ 14.) After reviewing the Facility, Julie Jones, NCB's account officer on the Facility, and Simon Penny, Head of Corporate Banking, decided not to renew or increase it. (Pl.'s Ex. 7; Penny Aff. ¶ 15.) The Credit Committee agreed and granted AMUK a limited extension. The extension allowed AMUK to borrow funds only through September 30, 1991 and required AMUK to repay all funds by December 31, 1991. (Pl.'s Ex. 8; Penny Aff. ¶ 16.) NCB and AMUK entered into a "Side Letter" to the Facility, which set forth the terms of the extension. (Pl.'s Ex. 9; Penny Aff. ¶ 17.)

## 3. Declaration of Default and Demand for Payment

On September 13, 1991, AMUK's management informed Simon Penny that AMUK would be unable to pay an invoice from H.M. Customs and Excise in the amount of £19,-963.82. (Penny Aff. ¶ 20; Pl.'s Ex. 10.) NCB paid the invoice and demanded reimbursement, but AMUK failed to repay NCB. (Penny Aff. ¶ 20.)

NCB notified AMUK and defendants by letter dated September 18, 1991 that AMUK's failure to reimburse NCB constituted a default under the Debenture and that NCB was under no further obligation under the Facility. (Pl.'s Ex. 11; Penny Aff. ¶¶ 22–23.) AMUK nonetheless continued to request additional funds from NCB. (Pl.'s Ex. 12, ¶ 18; Penny Aff. ¶ 24.) NCB's Credit Committee approved a £50,000 advance but informed AMUK that future requests would be denied unless AMUK agreed to certain conditions. (Pl.'s Ex. 13; Penny Aff. ¶ 25.) NCB also paid AMUK's tax bill at the request of AMUK's controller. (Pl.'s Exs. 14 and 15; Penny Aff. ¶¶ 26–27.) In mid-Octo-

---

**2.** As of the date of Eugene Schuster's deposition, defendant Venture Funding, Inc. owned 17% of A.M. Diagnostics, which in turn owned 100% of AMUK. (Schuster Dep. at 19) Schuster owned 49.5% of Venture Funding, and members of his family owned the remaining 51.5%. (Schuster Dep. at 17–18)

ber 1991, AMUK made another request for funds, which NCB denied after AMUK advised that it was unable to provide additional security. (Penny Aff. ¶¶ 27–28; Pl.'s Ex. 16.)

By letter to AMUK dated October 31, 1991, NCB demanded payment of £554,-299.58, the amount outstanding under the Facility. (Pl.'s Ex. 30; Penny Aff. ¶ 30.) That same day, NCB notified defendants that the amounts under the Facility had become due and demanded payment. (Pl.'s Ex. 31; Penny Aff. ¶ 31.) To date, neither AMUK nor defendants has paid NCB. (Penny Aff. ¶ 32.)

### 4. Receivership Sale

NCB appointed Gareth Hughes and Margaret Mills, partners in the accounting firm Ernst & Young, as joint administrative receivers of AMUK on November 1, 1991. (Penny Aff. ¶ 33; Pl.'s Ex. 20.) They concluded that if AMUK was sold as a going concern within a month its value could be maximized and the deterioration of its business halted. (Wollaston Aff. ¶ 16; Pl.'s Ex. 39.) Mr. Hughes' memorandum to NCB explained that the financial difficulties being experienced by A.M. Diagnostics ("AMD"), AMUK's 100% parent company, might impede the receivers' ability to achieve a going concern sale, and identified potential purchasers, including AMUK's London management and AMD. (Pl.'s Ex. 39, ¶¶ 1(b), 3.)

The receivers' advertisement appeared in the *Financial Times* of London on November 5. (Pl.'s Ex. 40.) The receivers also prepared a sales memorandum for potential purchasers. (Wollaston Aff. ¶ 18; Pl.'s Ex. 41.) Andrew Wollaston, who worked under Mr. Hughes on the AMUK sale, (Wollaston Aff. ¶¶ 1–2), personally responded to and followed up on all inquiries, (Wollaston Aff. ¶ 37), recording his efforts on a contemporaneous log. (Wollaston Aff. ¶ 29; Pl.'s Ex. 42.) The receivers met with Mark Maten, Vice President and Chief Financial Officer of AMD, to determine whether AMD would be interested in bidding for AMUK, but AMD

did not bid. (Wollaston Aff. ¶¶ 23–24; Pl.'s Ex. 45.)

AMUK's London management, who formed Monitor Bioscience Limited ("MBL") for the purpose of bidding for AMUK's assets, made the only offer for AMUK. (Wollaston Aff. ¶ 20.) MBL initially offered £80,-000. (Pl.'s Ex. 43.) After negotiating with the receivers, MBL raised its offer. (Wollaston Aff. ¶ 21; Pl.'s Ex. 44.) The receivers concluded that they could not hope to receive a higher offer, and on December 4, 1991 they sold most of AMUK's assets to MBL for £120,000. (Wollaston Aff. ¶ 26; Pl.'s Ex. 47.)

## DISCUSSION

### 1. Summary Judgment

Summary judgment is appropriate "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990). Conclusory allegations are not enough to defeat a motion for summary judgment. The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Defendants do not contest the elements of plaintiff's prima facie case: they concede that AMUK owes the debt, that defendants guaranteed payment of the debt, and that neither AMUK nor defendants has paid to date.[3] *See Chemical Bank v. Haseotes,* 13 F.3d 569, 573 (2d Cir.1994) (listing elements of guarantee claim). To defeat plaintiff's motion, defendants must show that a triable issue of fact remains with respect to one of their defenses.

### 2. Waiver of Defenses

▮▮▮ The 1990 Guarantees contained clauses waiving all defenses to enforcement except "fraud, or willful misconduct by NCB which the Guarantor has demonstrated has

---

**3.** Defendants did not controvert the paragraphs in plaintiff's 3(g) statement setting forth the elements of plaintiff's prima facie case. (*See* Plaintiff's Statement Pursuant to Local Civil Rule 3(g),

¶¶ 7, 14–16, 22; Defendant's Statement Pursuant to Local Civil Rule 3(g)). Thus, those assertions are deemed admitted.

caused it material harm." (Pl.'s Exs. 3 and 4, cl. 2.1.) New York law[4] permits a guarantor to waive contractually all defenses except fraud and certain violations of the Uniform Commercial Code. *E.g., Barclays Bank v. Heady Elec. Co.*, 174 A.D.2d 963, 571 N.Y.S.2d 650, 653 (3rd Dep't), *appeal dismissed*, 78 N.Y.2d 1072, 576 N.Y.S.2d 221, 582 N.E.2d 604 (1991). Thus, defendants' waivers are enforceable except to the extent they purport to waive the defense of commercial unreasonableness.

### 3. Fraudulent Inducement

■ Defendants argue they were fraudulently induced to enter into both the 1990 Guarantees and the 1991 extensions. On plaintiff's motion for summary judgment, defendants must come forward with evidence that would allow a reasonable jury to find, by clear and convincing evidence, that each of the elements of fraud has been satisfied. *The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F.Supp. 498, 505 (S.D.N.Y.1989).

#### a. 1990 Guarantees

■ Defendants contend they would not have entered into the 1990 Guarantees if Julie Jones had not fraudulently misrepresented the nature of the Facility to Eugene Schuster. (Defs.' Mem. at 1, 8.) Specifically, defendants assert Ms. Jones orally represented that AMUK was "the sort of business NCB was looking for" and that the Facility would be a "bridge" loan leading to permanent financing. (Schuster Aff. ¶¶ 7–8.) Although he knew the Facility expired by its terms after one year, Schuster believed the "bridge" language meant NCB would renew the Facility until AMUK obtained permanent financing. (Schuster Dep. at 47–48, 243–46; Defs.' Mem. at 1.)

Plaintiff denies Ms. Jones ever made the statements Schuster attributes to her and argues that the Facility documents flatly contradict Schuster's testimony. Even if Ms. Jones made the representations claimed by

Schuster, the fraud claim fails as a matter of law.

■ Under New York law, the elements of fraud are "(1) that [the defendant] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [the defendant] (5) that was made for the purpose of inducing [the plaintiff] to rely upon it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of its falsity (8) to his injury." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987)) (internal quotations omitted). Where, as here, the alleged misrepresentation concerns future conduct, the defrauded party must allege specific facts showing that the promisor intended not to honor her obligations at the time she made the statement. *National Westminster Bank v. Ross*, 130 B.R. 656, 664 (S.D.N.Y.1991), *aff'd sub nom. Yaeger v. National Westminster*, 962 F.2d 1 (2d Cir.1992). The defrauded party may not satisfy this requirement simply by showing that the future event never occurred. *Id.*

■ Defendants fail to allege any facts from which one might infer that at the time Julie Jones told Schuster the Facility was a "bridge" loan NCB did not intend to continue the relationship with AMUK. Indeed, defendants' explanation for NCB's change of heart regarding AMUK and the Facility—NCB's involvement in the BCCI banking scandal—suggests the opposite. (*See* Defs.' Mem. at 2; Schuster Aff. ¶ 13.) Further, a statement of opinion is not fraudulent under New York law unless it is not honestly held at the time it was made. *Mann v. Levy*, 776 F.Supp. 808, 813 (S.D.N.Y.1991). Defendants have not proffered any facts tending to show that Ms. Jones did not believe her alleged statement that "AMUK is the kind of business NCB is looking for."

#### b. Side Letter

■ Defendants' claimed defense of fraud in connection with the 1991 Side Letter appears to encompass two distinct arguments.

---

**4.** Because both parties rely on New York law in their briefs, this court assumes that New York law governs the Guarantees. *See Woodward & Dickerson v. Kahn*, 767 F.Supp. 530, 532 n. 3

(S.D.N.Y.1991) (assuming applicability of New York law to creditor's claim under guarantee containing a New York choice of law clause in absence of objection by either party).

First, defendants seem to argue that NCB committed fraud because its Credit Committee refused to increase the Facility or renew it for longer than six months despite Julie Jones' satisfaction with AMUK's performance. (Defs.' Mem. at 2, 8–9; Schuster Aff. ¶¶ 13–14.) However, absent an allegation that Ms. Jones misrepresented a material fact on which defendants relied, Ms. Jones' statements regarding AMUK's performance and NCB's subsequent failure to provide the requested financing cannot constitute fraud. *See Cohen,* 25 F.3d at 1172 (listing elements of fraud).

In addition, defendants contend they "renewed" their Guarantees in 1991 in reliance on the fact that AMUK would be able to draw on the Facility until September 30, 1991 and would have until December 31, 1991 to repay the loan. (Defs.' Mem. at 2–3; Schuster Aff. ¶ 15.) Plaintiff, however, seeks only to enforce the 1990 Guarantees, which provided that defendants' obligations were not extinguished by any renewal of the Facility. (Pl.'s Ex. 3, cl. 6(a); Pl.'s Ex. 4, cl. 7(a).) The guarantees renewed in 1991 in connection with the Side Letter do not relate to the Facility or the 1990 Guarantees. (Penny Aff. ¶ 46; Pl.'s Ex. 9.) The fraud defense does not present a triable issue of fact.

## 4. Commercial Reasonableness

Defendants argue that NCB did not dispose of the collateral pledged by AMUK to secure the loan in a commercially reasonable manner, and acted in bad faith with respect to those assets. Defendants claim that they did not receive adequate notice of the sale and as a result were denied the opportunity to overbid and purchase AMUK's assets. (Defs.' Mem. at 13.) They also assert that the receivers refused to provide financial and other information to potential purchasers, including defendants, as part of a conspiracy to allow AMUK's London management to purchase AMUK's assets at an artificially low price. (Schuster Aff. ¶¶ 23–28.)

Plaintiff, bearing the burden of proof on this issue, *General Elec. Credit Corp. v. Durante Bros. & Sons, Inc.,* 79 A.D.2d 509, 433 N.Y.S.2d 574, 576 (1st Dep't 1980), argues that the receivers' sale should be considered a judicial proceeding or sale by a representative of creditors and, thus enjoy the conclusive presumption of reasonableness accorded such sales under New York law. In any event, the receivers' disposition was commercially reasonable as a matter of New York law.

### a. Notice of Sale

Section 9–504(3) of New York's Uniform Commercial Code requires that a debtor receive reasonable notice before the disposition of his collateral after default. N.Y.U.C.C. § 9–504(3) (McKinney 1994). New York courts have held that a guarantor is a "debtor" within the meaning of Article 9 and is entitled to notice under § 9–504. *See Marine Midland Bank v. Kristin Int'l,* 141 A.D.2d 259, 534 N.Y.S.2d 612, 614–15 (4th Dep't 1988); *Marine Midland Bank v. CMR Indust., Inc.,* 159 A.D.2d 94, 559 N.Y.S.2d 892, 900 (2d Dep't 1990). Although neither party disputes that defendants were entitled to notice of the sale of AMUK's assets, they disagree over whether adequate notice was provided.

When collateral is sold at a public sale, the secured party must notify the debtor of the time and place of the sale. In contrast, when the collateral is to be disposed of in a private sale, § 9–504 requires only that the debtor receive "reasonable notification of the time after which any private sale or other intended disposition is to be made." N.Y.U.C.C. § 9–504(3) (McKinney 1994). A person has notice of a fact "when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." N.Y.U.C.C. § 1–201(25) (McKinney 1994).

Defendants' argument that they were entitled to notice of the time and place of the sale (Defs.' Mem. at 6, 13) is misplaced because the receivers did not conduct a public sale. Because the sale was private, as a matter of law, defendants received notice which satisfied § 9–504. Schuster knew at the latest by November 1, 1991, over a month before the sale, that NCB had appointed receivers. (Schuster Dep. at 193) During his deposi-

tion, Schuster admitted that he was aware that the sale was to be private. He learned through his attorney that there would be "no formal sale." (Schuster Dep. at 198) Schuster thus had actual knowledge of the time after which the assets would be disposed of in a private sale.

Defendants' real complaint about the notice seems to stem from the receivers' failure to keep defendants apprised of the amount and number of bids in a manner that might have allowed them to step in at the last minute and overbid MBL. (*See, e.g.,* Schuster Dep. at 138, 231, 233, 261; Schuster Aff. ¶¶ 13–14.). A secured party need not inform the debtor or guarantors of the progress of a private sale: " 'reasonable notification' does not relieve the debtor of all responsibility to act to defend its self-interest." *Matter of Excello Press, Inc.,* 890 F.2d 896, 903 (7th Cir.1989) (interpreting New York law). The receivers' and NCB's failure to apprise defendants of MBL's bid for AMUK does not mean defendants lacked reasonable notice of the time after which AMUK's assets would be sold.

### b. Disposition

Section 9–504(3) of New York's U.C.C. provides that "every aspect of the disposition [of a debtor's collateral] including the method, manner, time, place and terms must be commercially reasonable." N.Y.U.C.C. § 9–504(3) (McKinney 1994). A commercially reasonable disposition makes a "good faith attempt to dispose of the collateral to the parties' mutual 'best advantage.' " *Central Budget Corp. v. Garrett,* 48 A.D.2d 825, 368 N.Y.S.2d 268, 270 (2d Dep't 1975).

No genuine issue of fact is presented regarding the commercial reasonableness of this sale. Defendants' claim that the receivers did not provide requested information to potential purchasers, thus discouraging those who might have overbid MBL and keeping the price artificially low (Defs.' Mem. at 5; Schuster Aff. ¶¶ 22–24), is not supported by admissible evidence. Eugene

Schuster's report of Monis Schuster and Dr. Hafes' experiences with the receivers (Schuster Dep. at 207) is hearsay.[5] Likewise, Dr. Hafes' letter (Defs.' Ex. V) describes the efforts of others, not Hafes himself, to contact the receivers and thus rests on hearsay. Defendants have submitted no admissible evidence refuting Andrew Wollaston's sworn statement that he recorded and followed up on all inquiries. (Wollaston Aff. ¶ 19)

Defendants also argue that the sale was commercially unreasonable because MBL paid less for AMUK's assets than Eugene Schuster thought they were worth. (Defs.' Mem. at 7; Schuster Aff. ¶ 28) Although a "marked discrepancy" between the price obtained and the value of the collateral may "signal a need for closer scrutiny," *Central Budget Corp.,* 368 N.Y.S.2d at 270, such a price difference alone does not make a sale commercially unreasonable. *Marine Midland Bank v. St. Louis,* 75 A.D.2d 972, 428 N.Y.S.2d 528, 529 (3rd Dep't 1980). Plaintiff has submitted evidence explaining why potential purchasers might have been reluctant to bid for AMUK: AMUK was "very dependent" on AMD, which was experiencing financial difficulties (*See* Pl.'s Ex. 39) and AMD's production delays caused AMUK's earnings to suffer. (Pl.'s Ex. 41.) Defendants have not submitted any evidence— aside from Eugene Schuster's own speculation about AMUK's value at an unspecified time before the receivers' sale (*see* Schuster Dep. at 134–35, 139, 268–69)—to substantiate their claim that the price obtained was inadequate.

Defendants contend that if the receivers had waited longer, they could have realized more for the assets. (Defs.' Aff. ¶ 29; Schuster Dep. at 276–80.) A secured creditor is under no obligation to delay the sale of collateral, especially collateral that is declining in value, in the hope of obtaining a higher price unless the timing of the sale renders it commercially unreasonable. *Sumner v. Extebank,* 88 A.D.2d 887, 452 N.Y.S.2d

---

5. Rule 56 requires that affidavits submitted in opposition to a motion for summary judgment be made on personal knowledge. Fed.R.Civ.P. 56(e). An affidavit based on hearsay is not a substitute for the personal knowledge of a party. *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988).

873, 875 (1st Dep't 1982), *modified on other grounds,* 58 N.Y.2d 1087, 462 N.Y.S.2d 810, 449 N.E.2d 704 (1983). Here, the receivers believed that AMUK's assets were declining in value while its customers looked elsewhere for their needs. (Wollaston Aff. ¶ 16; Pl.'s Ex. 39.) The receivers did not sell AMUK until December 4, 1991, over a month after their appointment. (Pl.'s Ex. 47; Wollaston Aff. ¶ 26.) On the record submitted, the assertion of undue haste does not create a triable issue.

### 5. Other Willful Misconduct

Defendants contend that NCB engaged in wrongful conduct of various kinds in administering the Facility and conducting the sale. (*See, e.g.,* Defs.' Mem. at 3, 5, 6, 10–11.) Taking these arguments as directed towards such "willful misconduct" by NCB as would absolve defendants of liability under the Guarantees, they fall short.

#### a. Wrongful declaration of default

■ Defendants argue NCB was wrong to declare a default, because it could have allowed AMUK to draw down on the Facility rather than paying the invoice directly and demanding reimbursement. (Defs.' Mem. at 10; Schuster Aff. ¶¶ 16–17.) Eugene Schuster believed AMUK had the right to draw funds to pay the invoice because AMUK had drawn only £550,000 and the Facility maximum was £740,000. (Schuster Dep. at 152, 178–79.) This interpretation misconstrues the duty deferment guarantee and ignores the restrictions imposed by the Facility's borrowing formula.

The Facility provided that NCB was "irrevocably authorized to pay immediately any amounts demanded from [it] in connection with the Duty Deferment Guarantee … without any reference to or further authority from" AMUK and required that AMUK immediately repay those amounts to NCB. (Pl.'s Ex. 1, cl. 2(d)(iii).) Thus, the loan documents explicitly authorized NCB to pay customs invoices directly.

■ Even if the Facility permitted AMUK to draw funds for this purpose, AMUK could not have done so in September 1991 because it had already drawn the maximum amount permitted under the Facility's borrowing formula. When AMUK failed to pay the customs invoice, the balance outstanding was £575,000. (Pl.'s Ex. 24.) After NCB paid the invoice, the outstanding amount exceeded what was permitted under the borrowing formula. (Pl.'s Ex. 10.) Defendants have submitted no evidence [6] refuting plaintiff's assertion that AMUK breached the Facility's security covenant and the covenant requiring AMUK to repay amounts advanced by NCB under the duty deferment guarantee.

#### b. Wrongful appointment of receiver

■ Defendants' claim that NCB wrongfully appointed a receiver (*see* Defs.' Mem. at 13) appears to rest on assertions of improper appointment and inadequate notice of the appointment to defendants. First, defendants argue that NCB did not obtain the necessary consent of AMUK's directors for Ernst & Young to review AMUK's accounts. (Defs.' Mem. at 10.) Plaintiff, however, has submitted a business record of Julie Jones' conversation with Mike Treble, one of AMUK's statutory directors, in which Mr. Treble gave permission to NCB to send in Ernst & Young to ascertain AMUK's financial condition. (Pl.'s Ex. 17.) Defendants' statement that "such necessary consent was never obtained" (Schuster Aff. ¶ 18.) is an unsupported assertion by someone lacking firsthand knowledge and is insufficient to defeat a motion for summary judgment.

■ Second, defendants assert that NCB wrongfully appointed receivers for AMUK, (Defs.' 3(g) Statement, ¶ 12), but do not explain what was wrong with the appointment. As discussed above, NCB properly declared a default after AMUK failed to reimburse NCB. The Debenture provided that NCB could appoint a receiver if AMUK defaulted. (Pl.'s Ex. 2, cls. 8.01, 8.02.)

■ Finally, defendants assert that they "had no knowledge a receiver was appointed until the receiver was appointed." (Schuster

---

**6.** Eugene Schuster admitted that he did not know whether a borrowing formula limited the maximum amount available under the Facility. (Schuster Dep. at 153.)

Aff. ¶ 25.) Schuster admitted that he knew before November 1, 1991 that NCB was thinking about appointing a receiver, but he thought NCB was not serious about it. (Schuster Dep. at 169–70, 185, 193.) Defendants had no legal right to receive formal notice before the receiver was appointed.

### c. Excessive control

 Defendants assert that NCB "took control" of AMUK's "management, receivables, payables" and "other assets and liabilities" in September 1991. (Defs.' Mem. at 10; Schuster Aff. ¶ 17.) Because defendants' evidence consists of conclusory statements made by persons without firsthand knowledge, no genuine factual dispute remains on the issue of excessive control.

Eugene Schuster's affidavit is devoid of facts supporting the allegation of improper control by NCB. His deposition testimony shows that his knowledge of NCB's "control" derives entirely from unidentified documents and telephone calls, rather than firsthand knowledge. (*See* Schuster Dep. at 103–04.) Similarly, the letters written by Mike Treble of AMD (Defs.' Ex. P), Eugene Schuster (Defs.' Ex. Q), and Monis Schuster of Venture Funding (Defs.' Ex. R) containing conclusory allegations of control by NCB, do not set forth the facts on which these conclusions rest or the firsthand basis for knowledge of these facts. In short, defendants have provided no factual support for their assertion that NCB "took over" AMUK in September 1991.

### d. Conspiracy

Defendants assert that NCB conspired with AMUK's London-based management to destroy AMUK's business and allow AMUK to be sold in a management buy-out for far less than its true value. (Defs.' 3(g) Statement, ¶ 10.) The components of defendants' conspiracy claim—for example, the wrongful appointment of receivers, failure to apprise defendants of management's interest in bidding—have been rejected above.

NCB acted within its rights under the loan documents in declaring a default and appointing a receiver. The uncontroverted evidence shows that the receivers responded to all inquiries regarding AMUK and attempted to interest AMD in purchasing AMUK's assets. The receivers were not required under New York law to inform defendants of the progress of the private sale, the amounts bid and the identity of the bidders.

Defendants' allegation that the receivers manipulated the sale process to allow MBL to buy AMUK for a low price (Schuster Aff. ¶ 22; Defs.' Mem. at 5) does not comport with the facts. MBL submitted its initial bid of £80,000 on November 14, 1991. (Wollaston Aff. ¶ 21; Pl.'s Ex. 44.) The receivers did not immediately accept that offer, but instead convinced MBL to increase it by 50% to £120,000. (Wollaston Aff. ¶ 25.)

### CONCLUSION

Plaintiff's motion for summary judgment is granted. Plaintiff is instructed to submit a form of judgment with affidavits setting forth the calculation of damages and interest. Defendants have ten days to respond.